**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS, and THE MEDICAL ASSOCIATION OF GEORGIA, <br><br>    Plaintiffs, <br><br> vs. <br><br> BLUE CROSS AND BLUE SHIELD OF GEORGIA, INC.; BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC.; and ANTHEM INSURANCE COMPANIES, INC.; <br><br><br>    Defendants. | CIVIL ACTION NO. <br><br> _____ |

**COMPLAINT FOR LEGAL DAMAGES,
DEMAND FOR TRIAL BY JURY, AND
DEMAND FOR EQUITABLE, DECLARATORY AND
INJUNCTIVE RELIEF**

COME NOW, American College of Emergency Physicians ("ACEP"), individually and on behalf of its members, and The Medical Association of

Georgia ("MAG") (collectively, ACEP and MAG are referred to herein as "Plaintiffs"), and hereby file this Complaint for Legal Damages, Demand for Trial by Jury, and Demand for Equitable, Declaratory and Injunctive Relief, as to Defendants and/or their affiliated companies, stating as follows:

## <u>SUMMARY OF CLAIMS</u>

### 1.

Plaintiffs bring this action on behalf of themselves and their association members, who are emergency physicians. Plaintiffs are dedicated to advocating for the rights of their physician members, and patients alike, for the delivery of the highest quality of care to patients treated by the physician members.

### 2.

This Complaint was precipitated by mid-2017 correspondence from Defendants to their insureds in Georgia, Missouri and Kentucky.  The correspondence stated that the insured patients should "[s]ave the ER for emergencies – or you'll be responsible for the cost" and "[s]tarting June 1, 2017 [in Missouri and Kentucky, July 1, 2017 in  Georgia], you'll be responsible for ER costs when it's NOT an emergency."  ("the ER policy").  The ER policy was later expanded to Indiana, New Hampshire, and Ohio. The correspondence was

followed by presentations to providers and patients, wherein Defendants reiterated this position.

3.

Following the correspondence to their insureds, Defendants began retrospectively denying payments to certain healthcare providers, including Plaintiffs' members, for services already rendered by reclassifying emergency department encounters as "non-emergent."

4.

Defendants' policy of retrospectively denying payments and/or reimbursements for emergency department encounters deemed "non-emergent" by Defendants is contradictory to the "prudent layperson" standard found in 45 C.F.R. § 147.138(b)(4)(i).  Therein, an emergency medical condition is defined as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a *prudent layperson, who possesses an average knowledge of health and medicine*, could reasonably expect the absence of immediate medical attention to result in a condition described in clause (i), (ii), or (iii) of section 1867(e)(1)(A) of the Social Security Act (42 U.S.C. 1395dd(e)(1)(A)).

5.

While Defendants have taken the position in some forums that the "prudent layperson" standard applies to its review of emergency department encounters, Defendants' prior conduct, including without limitation their ad campaign to deter emergency department visits and retrospective denials of payment, has caused confusion among their insureds as to the correct standard and their recent attempts to backtrack have not been sufficient to adequately inform providers or the public of the correct standard. As a result, providers and patients alike are operating in fear of denial of payment by Defendants when patients seek emergency department care.

6.

The association Plaintiffs, and their members, have been harmed by Defendants' retrospective denials of payment for emergency department care unilaterally deemed "non-emergent" by Defendants as such payments are rightfully owed. The Plaintiffs have also been injured by the ER policy as a result of the substantial time and resources expended by Plaintiffs to inform and counsel their members and their members' patients regarding the ER policy. They have also devoted resources to respond to, and in some cases appeal, Defendants' denials on behalf of their members' patients. Plaintiffs have engaged in direct discussions

with Defendants with no resolution, and have engaged counsel to advise Plaintiffs on responses to Defendants' actions.   Plaintiffs prepared and published news releases and videos to assist their members and their members' patients in responding to Defendants' denials.  Finally, Plaintiffs have engaged and continue to engage Federal and State regulators on the matters alleged by Plaintiffs in this Complaint.

## JURISDICTION AND VENUE

7.

This honorable Court has subject matter jurisdiction over the claims presented pursuant to 28 U.S.C. § 1331 because the causes of action alleged herein arise under the laws of the United States. Federal question jurisdiction exists in this action because the matter in controversy involves health insurance coverage of emergency services as mandated under the Patient Protection and Affordable Care Act ("the ACA"), 42 U.S.C. § 18001.  In addition, the matter involves the administration of employee health benefit plans pursuant to the Employee Retirement Income security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 *et seq*.

8.

Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.1(B)(1) because (i) a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district; and (ii) Defendants Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. (collectively, "BCBSGa")are subject to this Court's personal jurisdiction with respect to the claims arising in this Complaint.

## PARTIES

9.

ACEP is a Texas Non-Profit Corporation, lawfully organized and created within the State of Texas. ACEP is domiciled within, and is a legal resident of the State of Texas with its principal office address being 4950 W. Royal Lane, Irving, Texas 75063. ACEP submits itself to the jurisdiction of this court.

10.

ACEP represents more than 38,000 emergency physicians, emergency medicine residents and medical students. ACEP actively promotes the highest quality of emergency care and is the leading advocate for emergency physicians, their patients, and the public in emergency departments.  ACEP's members practice at numerous hospitals throughout the metro Atlanta area, including without

limitation a significant number of emergency departments at hospitals located within Fulton and DeKalb Counties. Such hospitals are located within the jurisdiction of this Honorable Court.

11.

MAG is a Georgia Non-Profit Corporation, lawfully organized and created within the State of Georgia. MAG is domiciled within, and is a legal resident of the State of Georgia with its registered principal office address being 1849 The Exchange, Suite 200, Atlanta, GA 30339.

12.

Defendants are the plan administrators, claims administrators, and/or insurers for health plans and insurance policies covering residents of the State of Georgia, or their parent company, all of whom have engaged in and/or are actively engaged in the unfair and illegal practices delineated herein throughout the United States, including the State of Georgia.

13.

Upon information and belief, Blue Cross and Blue Shield of Georgia, Inc. is a Georgia Insurance Company, lawfully organized and created within the State of Georgia and doing business in the State of Georgia, including without limitation the counties of Fulton and DeKalb. Blue Cross and Blue Shield of Georgia, Inc. is

domiciled within, and is a legal resident of, the State of Georgia, with its registered agent located at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805. Blue Cross and Blue Shield of Georgia, Inc. may be served with process at this address. Upon information and belief, Anthem Blue Cross and Blue Shield is a registered trade name of Blue Cross and Blue Shield of Georgia, Inc. Anthem Insurance Companies, Inc., an Indiana Insurance Corporation ("Anthem"), is the parent company of Blue Cross and Blue Shield of Georgia, Inc.

14.

Upon information and belief, Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. is a Georgia corporation, lawfully organized and created within the State of Georgia and doing business in the State of Georgiawith its registered agent located at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805. Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. may be served with process at this address. Upon information and belief, Anthem Blue Cross and Blue Shield is a registered trade name of Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. Anthem Insurance Companies, Inc., an Indiana Insurance Corporation, is the parent company of Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.

15.

Upon information and belief, Anthem Insurance Companies, Inc. is an Indiana Corporation, lawfully organized and created within the State of Indiana with its registered agent located at 150 West Market Street, Suite 800, Indianapolis, IN, 46204. Anthem Insurance Companies, Inc. may be served with process at this address.

## BACKGROUND AND SUMMARY OF FACTS

16.

ACEP was founded in 1968 by a small group of physicians who shared a commitment to improving the quality of emergency care. As such, ACEP set out to educate and train physicians in emergency medicine to provide quality emergency care in the nation's hospitals.

17.

Today, ACEP represents more than 38,000 emergency physicians, emergency medicine residents and medical students. ACEP promotes the highest quality of emergency care and is the leading advocate for emergency physicians their patients, and the public.

18.

ACEP continually strives to improve the quality of emergency medical services through: the development of evidence-based clinical policies; funding emergency medicine research; providing public education on emergency care and disaster preparedness; legislative and regulatory advocacy efforts; providing industry-leading continuing medical education in the form of educational conferences, online training, professional references and news magazines; and publishing the *Annals of Emergency Medicine*, the specialty's leading peer-reviewed scientific journal.

19.

Plaintiffs' member physicians consist of emergency department physicians practicing in Georgia, including Medicare-participating hospitals, who provide critical and life-saving emergency care services to the Defendants' insureds.

20.

Physicians who practice in Medicare-participating hospitals are required to comply with various regulations, including the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

21.

Enacted in 1986, EMTALA is intended to prevent Medicare-participating hospitals with dedicated emergency departments from refusing to treat people based on their insurance status or ability to pay.

22.

EMTALA imposes two primary obligations on hospitals.  First, when an individual shows up for treatment at a hospital's emergency department, "the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition" exists. 42 U.S.C. § 1395dd(a). Second, if the screening examination indicates that an emergency medical condition does exist, the hospital ordinarily must "stabilize the medical condition" before transferring or discharging the patient. Id. at § 1395dd(b)(1)(A).

23.

Plaintiffs' member physicians treat and stabilize patients who are insured by a variety of insurers, including the Defendants.

24.

In mid-2017, Defendants sent letters to their insureds in Georgia, Missouri, Kentucky stating that patients should "[s]ave the ER for emergencies – or you'll be responsible for the cost" and "[s]tarting June 1, 2017 [in Missouri and Kentucky,

July 1, 2017 in Georgia], you'll be responsible for ER costs when it's NOT an emergency."

25.

ACEP took immediate action in response to the correspondence to educate its members on the dangers of the new ER policy.  First, on May 16, 2017, ACEP published a news release on its website informing the membership the ER policy was a "clear violation of the national prudent layperson standard."  In the release, Dr. Rebecca Parker, MD, FACEP, the then President of ACEP, is quoted as saying, "[i]f patients think they have the symptoms of a medical emergency, they should seek emergency care immediately and have confidence that the visit will be covered by their insurance."

26.

In the summer of 2017, Anthem's representatives attended a monthly meeting of ACEP's Missouri chapter to present on its ER policy. During the presentation, the representatives affirmed that Defendants would review emergency care based on diagnosis codes in addition to medical records in its review process. Anthem's representatives did not represent they would use the prudent layperson standard.

11

27.

On June 6, 2017, Donald J. Palmisano, Jr. J.D., Executive Director & Chief Executive Officer of the Medical Association of Georgia, sent correspondence following a call between MAG and Anthem.  MAG asked Anthony Sabatino, the Chief Medical Officer of BCBSGa, to answer several questions about the ER Policy.  Those included a request for the list of diagnoses that BCBSGa, in its retrospective review, would not cover.  Mr. Sabatino did not respond in writing.

28.

On June 9, 2017, ACEP published a news release on its website explaining Defendants' ER policy is "dangerous" and that it violates the prudent layperson standard outlined in 45 C.F.R. § 147.138(b)(4)(i). The release explained the prudent layperson standard and offered additional resources for its members and their patients, including educational materials and steps to take to voice opposition to Anthem's policy, which was adopted and implemented by Defendants.

29.

On June 29, 2017, American Medical Association Executive Vice President and CEO James L. Madara, MD sent a letter to Anthem's president and CEO calling for the company to rescind its ER policy, stressing that, "[t]he impact of this policy is that very ill and vulnerable patients will not seek needed emergency

medical care while, bluntly, their conditions worsen or they die." MAG posted Madara's letter to its own website along with the contact information for a MAG staff member to provide answers to members' questions about Defendants' ER policy.

30.

In an August 2017 article posted to the American Medical Association's website, MAG President Steven M. Walsh, MD called on Defendants to publicly share the data behind the ER policy, stating that "[p]atients shouldn't have to worry about conducting a self-diagnosis while wondering whether their insurer will cover the care they have paid for in the form of their premiums when they are in the middle of what they fear could be life-or-death medical emergency." Defendants provided no response.

31.

On August 1, 2017, ACEP President Rebecca B. Parker, MD, FACEP sent a letter to Defendants' parent company, Anthem, calling for it to rescind the ER policy, stating "[w]e are concerned that the new enforcement policy by some Anthem plans will have a chilling effect on patients' decisions to seek care, whether for themselves or for a loved one. It will take hearing only a few stories of neighbors, friends, or co-workers who were unexpectedly left with paying an entire

13

ED bill after coverage was denied by an Anthem plan to make policy-holders think twice about seeking care in an emergency. Such hesitation could be life-threatening, or result in even greater costs to the healthcare system down the road." Dr. Parker requested a meeting with the insurer in order to discuss alternatives to the ER policy.

32.

On August 21, 2017, ACEP President Rebecca Parker, MD, FACEP, ACEP Associate Executive Director of Public Affairs Laura Wooster, and Anthem's then Chief Clinical Officer Craig Sammit, MD, met via teleconference as requested in Dr. Parker's August 1 letter to discuss ACEP's concerns with the policy. Dr. Sammit described the insurer's rationale for instituting the program, stating that Anthem was seeing year over year increases in "inappropriate emergency department cases", claiming a rate of 20 percent of such cases in one market. ACEP requested the list of codes being used to trigger the denial process, and Dr. Sammit declined to share the list. He instead requested that ACEP provide Anthem a list of diagnoses that ACEP felt were non-emergent. Dr. Parker declined, stating that creating such a list would conflict with the prudent layperson standard.

14

33.

In September 2017, representatives from ACEP met with Sen. Ben Cardin (D-Md.) in Washington, D.C., where they discussed Defendants' newly-announced ER policy.

34.

On October 10, 2017, ACEP published a news release on its website about the ER policy in which Rebecca Parker, MD, FACEP, president of ACEP, is quoted as saying that the policy will have the effect of "scaring people away from emergency departments," and that "[h]ealth insurers can't expect patients to know the difference between a heart attack and something that is not life threatening."

35.

On October 20, 2017, ACEP staff and Anthem staff met via teleconference at Anthem's request to further discuss concerns with the ER policy. Participating in the call from Anthem were Omar Latif, MD; Jay Moore, MD, Senior Clinical Officer, and, Sam Marchio, Regional Vice President and Head of Congressional Affairs. Participating for ACEP were Sandy Schneider, MD, FACEP, Associate Executive Director, Clinical Policy; Laura Wooster, MPH, Associate Executive Director, Public Affairs; and, David McKenzie, Reimbursement Director. Dr. Moore described the denial process, confirming that medical records were not

being requested as part of it—instead, medical review was performed by an Anthem-employed physician on the claims submission itself.  ACEP noted that a claims submission provides an incomplete picture. Dr. Moore suggested that emergency departments could increase the level of information included in a claims submission to improve this, noting that many hospital systems no longer have a limit of only 4 diagnosis codes.

36.

ACEP has repeatedly met with key congressional offices for each of the six states affected by the ER policy to provide educational materials.  ACEP's members are also working with the district offices for those members of Congress. On December 20, 2017, Sen. Claire McCaskill (D-MO) sent a letter to Anthem President and CEO Joseph Sweden requesting information regarding the ER policy.

37.

"Patients are not physicians," McCaskill said in the letter. "I am concerned that Anthem is requiring its patients to act as medical professionals when they are experiencing urgent medical events. Missouri state law and federal law protect patients from having to make these types of medical decisions."

38.

On December 21, 2017, former ACEP Board member John Rogers, MD, FACEP and ACEP Associate Executive Director Laura Wooster met in person in Washington, DC with Jay Moore, MD, Senior Clinical Officer, Anthem Blue Cross Blue Shield, and, Sam Marchio, Regional Vice President and Head of Congressional Affairs for Anthem. In that meeting, Dr. Moore stated that Anthem estimates 30 to 40 percent of emergency department visits are avoidable.

39.

Despite ACEP and MAG's advocacy efforts, Defendants refused to publicly release the list of diagnosis codes used as a basis for considering which claims to deny in most of the states, including without limitation Georgia, a State in which the policy was implemented.

40.

On January 16, 2018, ACEP, along with 10 other national medical associations, sent a letter to Craig Sammit, MD, Executive Vice President and Chief Clinical Officer of Anthem expressing "deep concerns" and asking Anthem to rescind the "harmful" ER policy.  Defendants offered no response.

41.

In January 2018, ACEP launched a video campaign to demonstrate the dangers of the ER policy.

42.

In February 2018, Defendants announced via their website that changes were made to the ER policy, including expanding the list of "always-pay" exceptions to the ER policy, and now requesting medical records from the treating provider each time as part of the claim review process. The announcement also encouraged members to call 911 or go to the emergency department "[i]f you are experiencing a health emergency."  Defendants did not use the prudent layperson standard in describing the changes to the ER policy.

43.

Upon information and belief, additional exceptions to the emergency department policy include visits associated with an outpatient or inpatient admission and visits where a patient receives surgery, IV fluids or medications, or an MRI or CT scan.  However, these exceptions are not easily found on Defendants' website, nor have Defendants taken reasonable steps to inform the public of these exceptions and have not used the prudent layperson standard.

44.

On February 16, 2018, Anthem provided information to the American Journal of Managed Care for an article published the same day in which a spokesperson for Defendants was quoted as saying that a "minority of ER claims are reviewed to determine whether, under the prudent layperson standard, the patient experienced an emergency medical condition. These claims are first filtered through the 'always pay' exception list, and if they don't meet any of those exceptions, an Anthem medical director will review the claim information using the prudent layperson standard, and the claim may be denied."   Thus, this information remains conflicting as to what standard is being used by Defendants.

45.

This communication, which was provided to a trade association dealing in issues in managed care, is inconsistent.  Based on Defendants' failure to counter their previous highly marketed ER policy position, the public remains uninformed or uneducated as to Defendants' changes, if any, to its ER policy.

46.

On February 13, 2018, Senator Claire McCaskill (D-MO) issued a statement in response to Anthem's announcement of changes to the ER policy, noting that "[f]or families in Missouri who are being asked to self-diagnose a medical

emergency or risk getting saddled with tens of thousands of dollars in ER bills because of Anthem's policy, this isn't going to cut it. Anthem needs to take more meaningful action to change that reality and fully respond to my request for information underlying the rationale for this problematic policy."

47.

On February 27, 2018, ACEP joined with the American College of Radiology and the American Hospital Association to send a letter to Anthem Chief Clinical Officer Craig Sammit, MD stating concerns with the insurer's ER policy despite these changes, asking for the policies to be rescinded.

48.

On March 7, 2018 Anthem Chief Clinical Officer Craig Samitt, MD responded in a letter to ACEP, the American Hospital Association, and the American College of Radiology, saying that Anthem continued to welcome suggestions on how these policies could be enhanced, but still did not refer to the prudent layperson standard.

49.

On March 7, 2018, Senators Ben Cardin (D-MD) and Claire McCaskill (D-MO) sent a letter to Alex M. Azar, Secretary of the United States Department of Health & Human Services, and R. Alexander Acosta, Secretary of the United

States Department of Labor, requesting their departments "look into recent, potential Prudent Layperson Standard violations by certain health insurers in multiple states. As you know, patients must be able to seek emergency care without fearing their health insurance company will require prior authorization or deny their claims." The letter cited only examples of Anthem's policy, and asked if the Departments were aware of other insurers implementing "similar policies that discourage patients from seeking emergency medical care in emergency departments."

50.

On April 27, 2018, MAG released an episode of its informational "Top Docs" radio show in which the hosts discussed Defendants' ER policy and its violation of the prudent layperson standard. Dr. John Rogers, former member of the ACEP Board of Directors and a Macon, Georgia emergency physician, was interviewed as part of the episode. Rogers is also quoted in a May 7, 2018 article on the website of Atlanta's NPR affiliate, WABE, as saying that Defendants are "asking patients to decide or to diagnose themselves before they come to the emergency department…"

51.

On May 23, 2018, Dr. Paul Kivela, president of ACEP, was quoted in an article on NPR.org as saying that the ER policy deters patients from necessary trips to the emergency department and calls it a scare tactic.

52.

ACEP has also launched a petition on its website, asking patients to sign in agreement that "state and federal lawmakers must uphold the prudent layperson standard and require health insurance companies to provide fair coverage for emergency services."  The petition web page also provides a link for any patients who have been denied coverage for an emergency visit to share their stories.

53.

MAG published a website release encouraging Georgians to contact BCBSGa to: confirm what services will or will not be covered under their policy and how much money they will owe if BCBSGa determines that the care they receive is not deemed an emergency; schedule an annual wellness visit with a primary care physician to minimize the chance that they will need non-emergency care in an ER; contact the Georgia Insurance Commissioner to share their concerns or to file a complaint that is related to the ER policy; and to email their concerns and complaints related to the ER policy to MAG.

## ASSIGNMENT AND STANDING

### 54.

In an attempt to ensure prompt and efficient payment, Plaintiffs' member physicians require patients to assign their contractual rights to benefits and to payment under their plans to hospitals and Plaintiffs' physicians. Obtaining assignment of benefits agreements between patients and healthcare facilities is standard practice in the healthcare industry.

### 55.

Defendants' insureds routinely agree to assign their health insurance benefits, under their respective ERISA plan or individual insurance policies, to various Plaintiffs' member physicians. In addition, the Defendants' insureds routinely authorize Defendants' to pay insurance benefits directly to Plaintiff member physicians and / or hospitals.

### 56.

By assigning their health insurance benefits to Plaintiffs' member physicians, the Defendants' insureds have effectively transferred their rights to appeal denials for emergency department claims. Therefore, Plaintiffs, vis-à-vis their members, have been harmed by retrospective denials of payment by Defendants as such payments are rightfully owed in full.

57.

Likewise, Plaintiffs' members have been injured by the time and effort required to respond to inappropriate denials.

58.

Plaintiffs have also been injured directly by the requirement that they devote substantial time and resources to address these issues by counseling their members on their responses to Defendants' denials, as outlined herein.

## DEFENDANTS' WRONGFUL CONDUCT

59.

Defendants have implemented a *dangerous* policy in at least six states, including Georgia, which denies coverage to emergency patients based, in part, on "secret lists" of diagnosis codes—the ER policy.

60.

The ER policy is unlawful, in part, because it violates the prudent layperson standard set forth in the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 *et seq.* (the "ACA").

61.

The Defendants' ER Policy is unlawful, in part, because it violates EMTALA, by forcing providers to question the ultimate diagnosis prescribed to a

patient, in spite of their presenting symptoms, as the ultimate indicator of whether payment will be made by Defendants.

62.

The Defendants' ER policy violates the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by denying payment to assignees of health care benefits provided to Defendants' insureds who are enrolled in ERISA plans, and who have assigned benefits to physician members of Plaintiffs' associations.

63.

Plaintiffs' members are assignees of the health care benefits provided to the members' insureds who are enrolled in ERISA plans and have signed agreements, which contain provisions for assignments of benefits.

64.

The Defendants' ER Policy is also unlawful, in part, because it violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* by disproportionately affecting members of protected classes because it diminishes some protected classes' access to emergency care.

65.

Section 1557 is the nondiscrimination provision of ACA, and it incorporates and prohibits discrimination on the bases protected under other Federal statutes.

66.

The ACA provides: Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq*.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq*.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 *et seq*.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, *including* credits, subsidies, or *contracts of insurance*, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

67.

Medicare is a single-payer, national social insurance program funded by the United States Social Security Administration.

68.

The Centers for Medicare and Medicaid Services ("CMS") administers Medicare and parts of the ACA.

69.

No individual, company, business, nonprofit entity, or health insurance issuer offering group or individual health insurance coverage is required to participate in any Federal health insurance program created under the ACA, and there shall be no penalty or fine imposed upon any such issuer for choosing not to participate in such programs. If, however, an insurer elects to participate in any Federal health insurance program created by the ACA, it must comply with Section 1557 of the ACA.

70.

Upon information and belief, the Defendants have elected to participate in numerous Federal health insurance programs.

71.

Upon information and belief, the Defendants have a contract with the Federal government to review and process Medicare claims.

72.

Upon information and belief, BCBSGa offers various Medicare plans throughout the State of Georgia.

73.

Upon information and belief, BCBSGa offers the Federal Employee Health Program® as well as FEP BlueDental® and FEP BlueVision®.

74.

Upon information and belief, the Defendants participate in ACA plans on the ACA exchange, which is subsidized by the Federal government.

75.

Accordingly, the Defendants must follow all of the mandates set forth in the ACA.

76.

Defendants are also required to comply with Federal and state law applicable to group health regulations.

<u>COUNT ONE</u>
<u>VIOLATION OF PATIENT PROTECTION AND AFFORDABLE</u>
<u>CARE ACT ("THE ACA") 42 U.S.C. § 18001 AND THE EMERGENCY</u>
<u>MEDICAL TREATMENT AND ACTIVE LABOR ACT ("EMTALA"), 42</u>
<u>U.S.C. § 1395dd</u>

77.

The allegations contained in paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

78.

The ER policy is unlawful, in part, because it violates the prudent layperson standard set forth in the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 *et seq.*  (the "ACA").

79.

The prudent layperson standard requires the Defendants to cover the costs of emergency department visits based on the patient's symptoms; *not* their final diagnosis. It also eliminates the requirements for prior authorization before seeking emergency care.

80.

Accordingly, the prudent layperson standard means that a health plan must cover services delivered in an emergency department if the patient presents there with symptoms that a "prudent layperson," possessing an average knowledge of

29

health and medicine, could reasonably expect to result in serious impairment to his or her health.

81.

The prudent layperson standard is applicable to all federal health plans, and the standard extended to all insurance plans regulated under ERISA and qualified health plans in the state Exchanges.

82.

Notwithstanding this fact, and in direct contradiction to state and Federal law, including EMTALA, Defendants undertook a significant marketing effort to deter patients from ER visits when it notified patients and providers alike of its ER policy.

83.

Upon information and belief, the Defendants have engaged, and continue to engage, in a systemic practice of retrospectively reclassifying emergency department encounters as "non-emergent," and thereby denying payment for services which were rendered, even though such payment is rightfully owed in full.

84.

The Defendants' ER Policy is unlawful, in part, because it violates EMTALA, which prohibits physicians who practice in Medicare-participating hospitals refusing to treat people based on their insurance status or ability to pay.

85.

Defendants' ER policy forces providers to question the ultimate diagnosis prescribed to a patient, in spite of their presenting symptoms, as the ultimate indicator of whether payment will be made by Defendants.

86.

As a direct and proximate cause of Defendants' ER Policy, Plaintiffs have suffered harm.

87.

Injunctive relief is required to halt Defendants' ER policy, and to avoid further harm to Plaintiffs.

## COUNT TWO
## VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA"), PURSUANT to 29 U.S.C. § 1132(a)(1)(B)

88.

The allegations contained in paragraphs 1 through 87 are incorporated by reference as if fully set forth herein.

31

89.

Plaintiffs allege this claim for relief in connection with claims for health care services rendered to the Defendants' insureds, which include health benefit plans governed by ERISA. This is a claim to recover benefits, enforce rights, and clarify rights to benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

90.

Plaintiffs' members are assignees of the health care benefits provided to Defendants' insureds who are enrolled in ERISA plans and have signed agreements, which contain provisions for assignments of benefits.

91.

As an assignee of benefits under the Defendants' ERISA plans, Plaintiffs' members become beneficiaries entitled to enforce the terms of the insureds-assignors' ERISA Plans.

92.

On information and belief, the Defendants' ER Policy results in a plethora of denied emergency department claims. By failing to reimburse the Defendants' insureds for the costs of emergency department services, the Defendants have failed to pay Plaintiffs' members according to the terms of its insureds plans and in violation of state and Federal law.

93.

As a direct and natural consequence of Defendants' actions, Plaintiffs' members have suffered harm.

94.

As a direct and natural consequence of Defendants' actions, Plaintiffs have suffered direct harm as they have been forced to devote substantial time and resources to address these issues by counseling members on their responses to Defendants' denials, direct discussions with Defendants, engaging counsel to advise the association on responses to Defendants' actions, publishing news releases and videos to assist the association members with responding to Defendants' denials, and meetings with regulators.

## COUNT THREE
## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000D et seq.

95.

The allegations contained in paragraphs 1 through 94 are incorporated by reference as if fully set forth herein.

33

96.

Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives Federal funds or other Federal financial assistance, including insurers.

97.

Insurers and programs that receive Federal funds shall not distinguish among individuals on the basis of race, color or national origin, either directly or indirectly, in the types, quantity, quality or timeliness of program services, aids or benefits that they provide or the manner in which they provide them.

98.

This prohibition applies to intentional discrimination as well as to procedures, criteria or methods of administration that appear neutral, but have a discriminatory effect on members of protected classes because of their race, color, or national origin.

99.

Any policy or practice that has such an effect must be eliminated *unless* a recipient can show that they were necessary to achieve a legitimate, nondiscriminatory objective. However, even if there is such a reason, the practice

shall not continue if there are alternatives that would achieve the same objectives, but that would exclude fewer members of a protected class.

100.

The Defendants' ER Policy, although facially neutral, has a disparate impact on certain members of protected classes by limiting access to emergency department care.

101.

As a direct and proximate cause of Defendants' ER Policy, Plaintiffs and their members' patients— who are members of protected classes—have suffered harm.

## COUNT FOUR
## VIOLATION OF FEDERAL AND STATE LAW GROUP HEALTH REGULATIONS

102.

The allegations contained in paragraphs 1 through 101 are incorporated by reference as if fully set forth herein.

103.

Pursuant to 45 C.F.R. § 147.138(b) (1) and (2):

(1) If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides any benefits with respect to services in an emergency department of a hospital, the plan or issuer must cover emergency services (as defined in paragraph

(b)(4)(ii) of this section) consistent with the rules of this paragraph (b).

(2) General rules. A plan or issuer subject to the requirements of this paragraph (b) must provide coverage for emergency services in the following manner—

(i) Without the need for any prior authorization determination, even if the emergency services are provided on an out-of-network basis;

(ii) Without regard to whether the health care provider furnishing the emergency services is a participating network provider with respect to the services;

(iii) If the emergency services are provided out of network, without imposing any administrative requirement or limitation on coverage that is more restrictive than the requirements or limitations that apply to emergency services received from in-network providers;

(iv) If the emergency services are provided out of network, by complying with the cost-sharing requirements of paragraph (b)(3) of this section; and

(v) Without regard to any other term or condition of the coverage, other than—

(A) The exclusion of or coordination of benefits;

(B) An affiliation or waiting period permitted under part 7 of ERISA, part A of title XXVII of the PHS Act, or chapter 100 of the Internal Revenue Code; or

(C) Applicable cost sharing.

104.

Emergency medical condition is further defined by 45 C.F.R. § 147.138(b)(4)(i) as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a *prudent layperson*, *who possesses an average knowledge of health and medicine*, could reasonably expect the absence of immediate medical attention to result in a condition described in clause (i), (ii), or (iii) of section 1867(e)(1)(A) of the Social Security Act (42 U.S.C. 1395dd(e)(1)(A))." (emphasis added).

105.

Likewise, managed care plans in Georgia are required to comply with O.C.G.A. § 33-20A-9:

> (1)(A) In the event that a patient seeks emergency services and if necessary in the opinion of the emergency health care provider responsible for the patient's emergency care and treatment and warranted by his or her evaluation, such emergency provider may initiate necessary intervention to stabilize the condition of the patient without seeking or receiving prospective authorization by the managed care entity or managed care plan. No managed care entity or private health benefit plan may subsequently deny payment for an evaluation, diagnostic testing, or treatment provided as part of such intervention for an emergency condition.

106.

"Emergency services" are defined by Georgia law at O.C.G.A. § 333-20A-3

as:

> [T]hose health care services that are provided for a condition of recent
> onset and sufficient severity, including, but not limited to, severe pain,
> that would lead a prudent layperson, possessing an average knowledge
> of medicine and health, to believe that his or her condition, sickness,
> or injury is of such a nature that failure to obtain immediate medical
> care could result in:
>
> > (A) Placing the patient's health in serious jeopardy;
> >
> > (B) Serious impairment to bodily functions; or
> >
> > (C) Serious dysfunction of any bodily organ or part.

107.

Any attempt by Defendants then to use any other standard besides the

"prudent layperson" standard is a violation of both Federal and State regulations.

108.

As a direct and proximate cause of Defendants' ER Policy, Plaintiffs, their

members, and their members' patients have suffered harm.

## COUNT FIVE
## CLAIM FOR EXPENSES OF LITIGATION

### 109.

The allegations contained in paragraphs 1 through 108 are incorporated by reference as if fully set forth herein.

### 110.

Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiffs request that the Court allow reasonable attorney's fee and cost of action to be paid by the Defendants for the violations described herein.

### 111.

The Defendants have improperly withheld or retrospectively denied payments based on an incorrect standard in violation of the ACA and EMTALA.

### 112.

The Defendants have improperly withheld or retrospectively denied payments due and owing to a Plaintiffs' members pursuant to employee benefit plans covered by ERISA. Specifically, the Defendants' ER Policy results in a failure to remit payment due to Plaintiffs' members, as assignees, of Defendants' ERISA and insureds plans.

113.

The Defendants' actions have denied a protected class access to emergency department care.

114.

As a direct and proximate cause of Defendants' actions and their dangerous ER policy, Plaintiffs have retained the services of legal counsel and have necessarily incurred attorney's fees and costs in prosecuting this action. Plaintiffs anticipates incurring additional attorney's fees and costs in a final amount that is currently unknown.

115.

Accordingly, Plaintiffs seek to recover attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

**COUNT SIX**
**REQUEST FOR INJUNCTIVE RELIEF**

116.

Defendants have conspired to deprive Plaintiffs and its members of their rights in violation of Federal and state laws.  Plaintiffs are entitled to interlocutory injunctive relief, preventing Defendants from continuing to enforce its ER policy or from retrospectively denying benefits based on the ER policy.

117.

Plaintiffs are entitled to injunctive relief as the ER policy deprives it and its members of their rights.

118.

Plaintiffs are entitled to injunctive relief because they face irreparable harm should Defendants be allowed to enforce the ER policy or conduct retrospective denials based on it.

119.

The balance of equity clearly lies with Defendants.

120.

As such, Plaintiffs are entitled to, and pray for, temporary and interlocutory injunctive relief to prevent the enforcement of and retrospective denials based on the ER policy.

## **PRAYER FOR RELIEF**

Wherefore, ACEP and MAG respectfully request that this Court award the following relief:

A. Enforcement of the prudent layperson standard set forth in the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 *et seq.*

41

B. Payments for all benefits due under ERISA plans pursuant to 29 U.S.C. § 1132(a)(1)(B);

C. An injunction prohibiting Defendants from implementing the ER policy with respect to previous or forthcoming healthcare insurance claims;

D. Declaratory Judgement that the Defendants' ER policy violates the prudent layperson standard set forth in the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 *et seq*;

E. Declaratory Judgement that the Defendants' ER Policy violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq*.;

F. Compensatory damages with pre-judgment and post-judgment interest;

G. An appropriate equitable remedy for Defendants' continued failure to pay ACEP's members for the services the members legitimately provided to the Defendants insureds;

H. A jury trial on all issues that are triable by jury;

I. All cost and expense of this litigation including its attorney's fees and expenses; and

J. Such other and further relief as the court deems just and proper.

Respectfully submitted this 17th day of July, 2018.

**HALL BOOTH SMITH, P.C.**

/s/ HOWARD W. REESE, III
Howard W. Reese, III
Georgia Bar No. 598178
BRITTANY H. CONE
Georgia Bar No. 488550

*Attorneys for American College of
Emergency Physicians and The Medical
Association of Georgia*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1775
Tel:  404-954-5000
Fax:  404-954-5020
Email:  treese@hallboothsmith.com
Email:  bcone@hallboothsmith.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS, and THE MEDICAL ASSOCIATION OF GEORGIA, | |
| Plaintiffs, | |
| vs. | CIVIL ACTION NO. |
| BLUE CROSS AND BLUE SHIELD OF GEORGIA, INC.; BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC.; and ANTHEM INSURANCE COMPANIES, INC. | _____ |
| Defendants. | |

**CERTIFICATE OF COMPLIANCE**

The foregoing **COMPLAINT FOR LEGAL DAMAGES, DEMAND FOR TRIAL BY JURY, AND DEMAND FOR EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** is double-spaced in 14 point Times New Roman font and complies with the type-volume limitation set forth in Local Rule 7.1.

44

Respectfully submitted this 17th day of July, 2018.

**HALL BOOTH SMITH, P.C.**

/s/ HOWARD W. REESE, III
Howard W. Reese, III
Georgia Bar No. 598178
BRITTANY H. CONE
Georgia Bar No. 488550

*Attorneys for American College of
Emergency Physicians and The Medical
Association of Georgia*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1775
Tel:  404-954-5000
Fax:  404-954-5020
Email:  treese@hallboothsmith.com
Email:  bcone@hallboothsmith.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

AMERICAN COLLEGE OF
EMERGENCY PHYSICIANS,
INDIVIDUALLY AND ON
BEHALF OF ITS MEMBERS, and
THE MEDICAL ASSOCIATION OF
GEORGIA,

     Plaintiffs,

vs.

BLUE CROSS AND BLUE SHIELD
OF GEORGIA, INC.;
BLUE CROSS BLUE SHIELD
HEALTHCARE PLAN OF
GEORGIA, INC.; and
ANTHEM INSURANCE
COMPANIES, INC.

     Defendants.

CIVIL ACTION
NO.

_____

**CERTIFICATE OF SERVICE**

     I hereby certify that I have this day served a copy of the within and foregoing **COMPLAINT FOR LEGAL DAMAGES, DEMAND FOR TRIAL BY JURY, AND  DEMAND FOR EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following

parties of record below and by depositing a true copy of the same in the U.S. Mail,

with adequate postage affixed thereon, addressed as follows:

Blue Cross and Blue Shield of Georgia, Inc
Registered Agent – CT Corporation System
289 S. Culver Street
Lawrenceville, Georgia 30046-4805

Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
Registered Agent – CT Corporation System
289 S. Culver Street
Lawrenceville, Georgia 30046-4805

Anthem Insurance Companies, Inc.
Registered Agent – CT Corporation System
120 Monument Circle, Indianapolis, IN 46204

Respectfully submitted this 17th day of July, 2018.

**HALL BOOTH SMITH, P.C.**

/s/ HOWARD W. REESE, III
Howard W. Reese, III
Georgia Bar No. 598178
BRITTANY H. CONE
Georgia Bar No. 488550

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1775
Tel: 404-954-5000
Fax: 404-954-5020
Email: treese@hallboothsmith.com
Email: bcone@hallboothsmith.com

*Attorneys for American College of Emergency Physicians and The Medical Association of Georgia*